Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

March 30, 2018

Steven M. Kayman
Member of the Firm
d +1.212.969.3430
f 212.969.2900
skayman@proskauer.com
www.proskauer.com

By ECF

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *Blink Health Ltd. v. Hippo Technologies LLC,* Case No. 18 CV 2258 (PKC)

Dear Judge Castel:

We represent defendant Hippo Technologies LLC ("Hippo"), a start-up company that helps consumers to save money on and manage prescription drugs. Hippo was co-founded by Charles Jacoby and Gene Kakaulin, both of whom are former officers of plaintiff Blink Health Ltd. ("Blink"), a Bermuda company and a well-funded, more established competitor of Hippo's. In accordance with Rule 4.A of your Honor's Individual Practices, we write to request the Court's permission to move to compel arbitration of Blink's claims and to dismiss this case or stay it pending the completion of the arbitration.[1]

For the reasons set forth below, Hippo, Jacoby and Kakaulin have a compelling need for expedition. Our hope is that, with the Court's guidance, this case can be resolved at a conference, as was a predecessor state court action just last month. We respectfully request that the Court hold a conference at its earliest convenience. Alternatively, if it proves impossible to resolve this case consensually, we ask the Court to accept this admittedly longish letter as Hippo's moving brief on a motion to compel arbitration and grant us leave to file a reply brief as part of an expedited briefing schedule.

This case follows on the heels of a substantively identical case that Blink commenced on February 2, 2018, in New York Supreme Court, against Jacoby, Kakaulin and Hippo. Blink "voluntarily" withdrew the case just 22 days later. The crux of Blink's state court complaint was that Jacoby and Kakaulin misappropriated Blink's alleged trade secrets to create Hippo, in breach of separate settlement agreements that Blink entered into with both Jacoby and Kakaulin a year earlier (the "Settlement Agreements"). Days after commencing the case, Blink served

---

[1] The preliminary conference in this case is scheduled for May 14, 2018.



Page 2

eleven subpoenas on potential Hippo investors and business partners, making its true purpose – to harass Hippo as part of a campaign to keep it from competing with Blink – entirely evident. In response, Jacoby, Kakaulin and Hippo moved by order to show cause to compel arbitration of Blink's claims based on arbitration clauses in the Settlement Agreements. They also sought a stay of all discovery, including the subpoenas, pending a determination of the motion.

At a hearing held on February 21, Justice O. Peter Sherwood made clear to Blink's then-counsel, Paul Weiss, his view that Blink's claims were all subject to arbitration, and that it is in all events for the arbitrator to decide the arbitrability of the claims. The court gave Blink to the end of the day to decide whether to voluntarily withdraw the case – as Blink did, filing a stipulation of discontinuance two days later. The case files – which had been filed under seal due to confidentiality provisions in the Settlement Agreements, but which Blink had immediately thereafter sought to unseal – have remained under seal ever since.

Had Blink genuinely believed it had valid claims against Jacoby and Kakaulin for misappropriation of its trade secrets, it would have sought emergent injunctive relief or adhered to Justice Sherwood's admonishment and commenced an arbitration.[2] But the confidentiality of an arbitration defeats Blink's actual objective in bringing the state court litigation and now this one: to engage in a character assassination of Jacoby and Kakaulin, to scare off Hippo's existing and potential investors and strategic partners, to entangle our clients in expensive and time-consuming litigation, and ultimately to eliminate Hippo from the prescription savings landscape. So rather than commence an arbitration, Blink, after retaining new counsel, Gibson Dunn, commenced this action, this time naming only Hippo as a defendant in the hope of evading the arbitration clauses in the Settlement Agreements. And this time Blink filed its complaint publicly, in flagrant violation of the confidentiality provisions in the Settlement Agreements. It magnified the effect of the filing by simultaneously contacting the press to alert them to the complaint.

The crux of Blink's claims in this case, however, is the same as that of its state court complaint, and those claims are just as arbitrable as were the ones Blink withdrew. Blink cannot circumvent its arbitration obligations by naming only Hippo as a defendant and purporting to attribute to Hippo acts that Blink alleges to have been committed by Jacoby and Kakaulin. Nor can it circumvent them by asserting causes of action other than for breach of the Settlement Agreements. As Justice Sherwood put it, "***you think that you have pleaded around your own . . . Settlement Agreement?***" (Tr. of February 21, 2018 hearing ("Tr."), at 10) (emphasis added) Blink is trying to do precisely the same thing here – plead around broad arbitration provisions that it, in fact, originally proposed. It cannot and should not succeed. Accordingly, Jacoby, Kakaulin and Hippo, commenced an arbitration against Blink earlier today in the American Arbitration Association ("AAA"), seeking, among other things, a declaratory judgment that

---

[2] Blink also rejected Jacoby's and Kakaulin's proposal, made days after the state court action was filed, to jointly retain a qualified neutral expert to ascertain whether Blink actually had any bona fide trade secrets and, to the extent it did, to determine whether Jacoby and Kakaulin had misappropriated them for use by Hippo.



Page 3

neither Jacoby nor Kakaulin ever misappropriated any of Blink's trade secrets, to the extent they are actually secrets at all.[3]

Although Hippo is proceeding by way of this pre-motion letter rather than moving by order to show cause, as Jacoby, Kakaulin and Hippo did in Blink's state court action, the need for expedited relief is no less urgent now than it was then.  In the state court action, Blink was not only trying to unseal its complaint so as to malign defendants publicly, but it had also sought to harass Hippo's potential investors and business partners by serving them and others with eleven non-party subpoenas.  In this case, Blink filed its federal complaint publicly and has not yet served any party or non-party discovery.  But its public filing has had its intended effect of impairing Jacoby's and Kakaulin's capital-raising efforts and damaging or delaying the consummation of certain of Hippo's important business relationships.

The harm that Hippo, Jacoby and Kakaulin have incurred underscores the need to resolve this case as quickly as possibly through a directive to arbitrate.  Arbitration, by its nature, allows for a faster, less expensive resolution of disputes such as this one, and the arbitration commenced today will enable Jacoby and Kakaulin to provide greater predictability to Hippo's investors and strategic partners.  We accordingly request, as noted, that a conference with the Court be held at the Court's earliest convenience to see whether the need to pursue the motion to compel arbitration may be obviated, and, if not, to set an expedited briefing schedule on the motion.

THE FACTUAL AND PROCEDURAL
CONTEXT FOR THE MOTION TO COMPEL

A.   The Settlement Agreements and
     Their Arbitration Provisions

The prescription savings industry is relatively new and vitally important to millions of consumers burdened by high prescription costs.  Blink has been in the industry since 2014.  Hippo began offering its products and services publicly just a couple of months ago.  Despite its long history of disputes with employees, investors and strategic partners, Blink has managed to attract substantial outside investments, announcing in April 2017 that it raised $165 million in capital.  That capital has enabled Blink to fund, among other things, multiple litigations in which

---

[3]   Because, under the Settlement Agreements and AAA rules, the arbitration is confidential, we are not attaching the arbitration demand to this letter.  We have also not attached the Settlement Agreements, which are also confidential.  However, we would be pleased to provide the Court with copies of these and any of the state court pleadings, for in camera review, upon request.  We also note that Blink, by filing a public complaint in this Court, in breach of the Settlement Agreements, has waived any right to insist upon confidentiality.  Our clients are, as a result, freed of their counterpart obligation though their present intention is preserve what remains confidential following Blink's breach.

As to the transcript of the February 21, 2018 hearing before Justice Sherwood, it is not confidential and may be publicly quoted from.  Although the case files in the state court action are under seal, the February 21 hearing was held in open court, and the transcript of the hearing is not part of the case files.



Page 4

it is or has been involved.  Those litigations include this one and its state court predecessor, both of which have had the sole objective of crippling Hippo's ability to compete with Blink – to the detriment not only of Blink, Jacoby and Kakaulin, but of consumers nationwide.

Jacoby, Blink's former general counsel and now Hippo's general counsel, and Kakaulin, Blink's former chief financial officer and now Hippo's chief executive officer, were fired or forced out by Blink after protesting many of Blink's business practices and being cheated themselves.  Kakaulin, on October 31, 2016, brought a federal court action against Blink and its two founders.  That suit settled two months later, with the settlement memorialized in the "Kakaulin Agreement."  Jacoby had also threatened Blink with legal action, and the eventual settlement of his dispute with Blink was memorialized in the "Jacoby Agreement."  Each Settlement Agreement references and incorporates a prior agreement (the "NDA Agreement") that Blink had entered into with Jacoby on July 31, 2015 and with Kakaulin on August 11, 2015.  The NDA Agreements prohibit the use of Blink's confidential information for any entity other than Blink.

Of critical importance to both Settlement Agreements was the emphasis the parties placed on maintaining the confidentiality not only of the agreements themselves, but of any future disputes relating to the agreements.  Each Agreement accordingly included – in their initial drafts, prepared by Paul Weiss, and in every subsequent draft – a comprehensive arbitration clause aimed at shielding any possible future disputes from public view.

The arbitration clause in the Jacoby Agreement, at ¶15, states in pertinent part:

> Arbitration:  ***Any*** dispute ***regarding this Agreement*** which cannot be resolved by negotiations between Employee and the Company ***shall*** be submitted to, and ***solely*** determined by, final and binding arbitration conducted by the Employment Rules of the American Arbitration Association ("AAA") in accordance with its arbitration rules applicable to employment disputes, and the parties agree to be bound by the final award of the arbitrator in any such proceeding.  The Company shall pay all fees and costs of the arbitration, including the arbitrator's fees.  The arbitrator shall apply the laws of the State of New York with respect to the interpretation or enforcement of this Agreement . . . . ***All questions regarding whether or not a dispute is subject to arbitration will be resolved by the arbitrator***.  Arbitration shall be held in the AAA New York City Office, or such other place as the parties may mutually agree.  Judgment upon the award by the arbitrator may be entered in any court having jurisdiction.  The arbitrator shall award costs and attorney fees to the prevailing party.  [Emphasis added]

The arbitration clause in the Kakaulin Agreement, at ¶20, is also mandatory and just as broad.  It states in pertinent part:

> Dispute Resolution.  ***Any*** dispute or controversy ***arising out of or relating to this Agreement***, including any claims under any statute, law, or regulation, between



Page 5

> Kakaulin on the one hand, and the Blink Parties, or any of their respective officers, directors, or employees on the other hand, ***shall*** be resolved ***exclusively*** by arbitration, *except* that any Party seeking injunctive or other equitable relief shall be permitted to pursue such relief directly in a court of law. Any arbitration shall be conducted before a single arbitrator in New York, New York (applying New York law) in accordance with, and pursuant to, the American Arbitration Association's ("AAA") Commercial Arbitration Rules. . . . The decision of the arbitrator shall be final and binding upon the Parties. [Emphasis in bold added]

The arbitration clause in the Kakaulin Agreement also underscores the importance the parties attached to maintaining the confidentiality of any disputes such as this one. It states (at ¶20):

> ***The arbitration shall be conducted on a strictly confidential basis***, and the Parties shall not disclose the existence or nature of any claim; any documents, correspondence, briefing, exhibits, or information exchanged or presented in connection with any claim; or any ruling, decision, or results of any claim or argument (collectively, "Arbitration Materials") to any third party, with the sole exception of legal counsel . . . . ***The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any such proceeding, agree to use their best efforts to file all Confidential Information (and documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality of this Agreement.*** [Emphasis added]

The parties' mutual desire for comprehensive arbitration clauses was no accident. Blink, with its history of disputes with employees, investors, business partners and vendors, presumably wanted to avoid having that history exposed again to the public, as Kakaulin had done in his federal court complaint. Jacoby and Kakaulin, aware of Blink's litigiousness and lack of compunction about denigrating people publicly, likewise wanted protection in the future from any possible public attack on their character – the very kind of attack, made with little regard for the truth, embodied in Blink's state and federal court complaints.

B.   The Nature of Blink's Claims in This Action and of the Claims in
     the Arbitration Commenced by Jacoby, Kakaulin and Hippo Against Blink

The state court action was brought literally on the eve of Hippo "going live" by making its mobile "app" available to smartphone users. Blink's complaint portrayed Jacoby and Kakaulin in the worst possible light, falsely and often gratuitously. Its trade secret allegations were conclusory, never specifying what non-public information was claimed to have been misappropriated. Although Blink alleged the need for injunctive relief, it never sought a TRO or preliminary injunction because it knew it had no basis for or chance of obtaining such relief. Instead, Blink resorted to harassing non-party subpoenas and blunderbuss document requests



served on the defendants. As noted, Blink withdrew that case after Justice Sherwood read the "riot act" to Blink's counsel.

Undeterred by its debacle in state court, Blink commenced this action on March 14 after either firing its previous counsel (Paul Weiss) or being fired by it. Although it does not name Jacoby and Kakaulin as defendants, Blink's complaint is substantively identical to its state court complaint, repeating the same core allegations that Jacoby and Kakaulin misappropriated Blink's confidential information to create Hippo. And like the state court complaint, the federal court complaint then descends into repeated name-calling, describing Jacoby and Kakaulin as thieves and fraudsters who engaged in "lying to potential investors" and "peddling a fake corporate narrative to consumers," and who "stole Blink trade secrets and attempted to blackmail Blink." Hippo, meanwhile, is referred to as a "rogue and fraudulent enterprise that is trying to cheat its way in the market by outright thievery." Those and other comparable allegations are false, scandalous and illustrative of what Jacoby and Kakaulin believe is Blink's misuse of the court system to interfere with fair competition from Hippo. And they all stem from the same core allegations that Jacoby and Kakaulin misappropriated Blink's alleged trade secrets to create Hippo, in breach of the Settlement and underlying NDA Agreements.

Earlier today, Jacoby, Kakaulin and Hippo commenced an arbitration against Blink with the AAA. The Statement of Claims asserts multiple claims for relief, including that Blink's court filings, non-party subpoenas and other acts violated the arbitration and non-disparagement clauses in the Settlement Agreements and constitute both abuse of process and tortious interference with prospective business relations. Jacoby, Kakaulin and Hippo also seek a declaratory judgment that they did not misappropriate Blink trade secrets or other confidential information, and an award of attorneys' fees under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, for Blink's bad-faith allegations of misappropriation.

THE LEGAL BASES FOR COMPELLING
<u>ARBITRATION OF BLINK'S CLAIMS</u>

Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, applicable here due to the nationwide scope of Blink's business, all of Blink's claims are subject to arbitration. That the subject matter of Blink's claims is within the scope of the arbitration clauses in the Settlement Agreements is beyond dispute, as Justice Sherwood immediately recognized. And while Hippo is not a signatory to an arbitration agreement with Blink, Blink's claims against it are arbitrable, as Justice Sherwood also recognized, because they are inextricably intertwined with the allegations against Jacoby and Kakaulin, who are the focus of Blink's complaint and claimants in the arbitration against Blink. Considerations of judicial economy further compel that Blink be directed to arbitrate its claims, which will effectively already be adjudicated on Jacoby's and Kakaulin's declaratory judgment claim in the arbitration. In all events, the threshold issue of arbitrability is one for the arbitrator, not this Court, to decide.

**Proskauer»**

Page 7

### A. The Arbitration Clauses Mandate that the Arbitrator, Not This Court, Decide the Arbitrability of Blink's Claims

The arbitration clauses in the Settlement Agreements evince the parties' clear intent to submit questions of arbitrability to the arbitrator. The clause in the Jacoby Agreement expressly confirms as much, stating: "***All questions*** regarding whether or not a dispute is subject to arbitration will be resolved ***by the arbitrator***." (Emphasis added) The clause reinforces the parties' intent by incorporating by reference the AAA's Employment Rules, which in Rule 6(a) state that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." The arbitration clause in the Kakaulin Agreement also incorporates AAA rules, stating that any arbitration is to be held "in accordance with, and pursuant to, the [AAA]'s Commercial Arbitration Rules." Rule 7(a) of those rules states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

When parties incorporate AAA or comparable rules into their arbitration agreements, "*Contec* [*Contec Corp. v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005)] requires the conclusion that the [arbitration agreement] delegates to arbitrators the decision on arbitrability . . . ." *Lismore v. Société Générale Energy Corp.*, No. 11 Civ. 6705 (AJN), 2012 WL 3577833, at *5 (S.D.N.Y. Aug. 17, 2012) (assessing incorporation of AAA's Employment Rules). That rule applies with equal force when a signatory to an arbitration agreement seeks to avoid arbitration with a non-signatory to the agreement. Thus, as Judge Sweet ruled in *Lapina v. Men Women N.Y. Model Management Inc.*, 86 F. Supp. 3d 277, 284 (S.D.N.Y. 2015), "where a party seeking to avoid arbitration is a signatory to an arbitration agreement which incorporates rules that delegate arbitrability questions to the arbitrator, ***a court need not reach the issue of whether a non-signatory may compel arbitration, because that is an issue properly resolved by the arbitrator.***" (Citing *Contec*, 398 F.3d at 209 (emphasis added).)

Indeed, as Justice Sherwood, after reading into the record the provision in ¶15 of the Jacoby Agreement providing that the arbitrator resolves "all questions" as to whether a claim is subject to arbitration, stated: "***That is kind of the end of it, isn't it?***" (Tr. at 13)

### B. Blink's Claims Against Hippo Are Arbitrable Even Though Hippo Is Not a Signatory to an Arbitration Agreement with Blink

Because the arbitrability of Blink's claims is for the arbitrator to decide, this Court need not, and should not, make that determination itself. *E.g.*, *Lapina, supra*. So long as Blink's claims are at least arguably subject to arbitration – a test that is easily met here – they should be dismissed without prejudice or stayed and sent to arbitration. The only issue at hand is whether Hippo, as a non-signatory to the Settlement Agreements, can invoke the arbitration clauses in those agreements to compel arbitration of Blink's claims. Ample authority, discussed below, supports the conclusion that it can. And even in the unlikely event the arbitrator were to deem some of Blink's claims non-arbitrable, those claims should not go forward in this action until



after the arbitration is completed.  The core issue in dispute between the parties – whether Jacoby and Kakaulin misappropriated bona fide trade secrets of Blink's – permeates all of Blink's claims, and the resolution of that issue in the arbitration will, under principles of res judicata and collateral estoppel, be binding on Blink and obviate the need for, in all likelihood, any post-arbitration proceedings in this action.

Under principles of equitable estoppel, the Second Circuit has consistently held that "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (recognizing that courts "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" (emphasis in original)).

In determining whether an arbitration agreement allows non-signatories to invoke equitable estoppel, courts have "established a two-part 'intertwined-ness' test, under which they examine whether:  (1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) whether there is a 'close relationship' between the signatory and the non-signatory party."  *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 476 (S.D.N.Y. 2013).  That inquiry is "fact-specific," *JLM Indus.*, 387 F.3d at 178 n.7, and relational sufficiency may be demonstrated on a motion to compel arbitration when either "(a) the non-movant effectively consented to extend its agreement to arbitrate to the moving party; or (b) it would be inequitable to allow the non-movant to avoid arbitration with the moving party."  *Gov't Employees Ins. Co. v. Grand Med. Supply, Inc.*, No. 11 Civ. 5339(BMC), 2012 WL 2577577, at *4 (E.D.N.Y. July 4, 2012).  Both prongs of that two-part analysis are clearly satisfied here.

First, the fact issues raised by Blink's claims are undisputedly intertwined with those raised by Blink's allegations that Jacoby and Kakaulin breached the NDA Agreements incorporated into the Settlement Agreements by misappropriating Blink trade secrets to create Hippo.  Indeed, Blink's claims against Hippo arise solely from Jacoby's and Kakaulin's alleged breach, and raise the same legal and factual issues to which that alleged breach gives rise.  Specifically, Blink alleges that Jacoby and Kakaulin had access to confidential Blink information in their former positions at Blink and pursuant to their NDA Agreements; that they breached their obligations under the Settlement Agreements by exploiting such information to co-found a company allegedly premised on the copying of Blink's trade secrets and proprietary business model; and that Jacoby and Kakaulin are an integral part of an ongoing Hippo "scheme" to further misappropriate Blink's alleged trade secrets, to compete unfairly with Blink and to tortiously interfere with Blink's contracts and business relations.  Setting aside that Blink's allegations are meritless, what matters for now is that they are intimately bound up with rights and obligations set forth in the Settlement Agreements and the alleged breach thereof by Jacoby



Page 9

and Kakaulin.  As Justice Sherwood stated at the February 21, 2018 hearing, "[t]hey, Hippo, may be in possession of this confidential information, ***but [the] – my word – bad actors are individuals; isn't that right?***"  (Tr. at 6 (emphasis added))  Justice Sherwood went on to add that Hippo, and anyone else besides Jacoby and Kakaulin, "are downstream bad actors."  (Tr. at 7)

Second, the nexus among the parties, in light of the legal and factual issues in controversy, confirms that it would be inequitable for Blink to refuse to arbitrate its claims against Hippo.  Jacoby and Kakaulin are in close corporate affiliation with Hippo, having co-founded it, having invested in it, and having assumed the roles of its general counsel and chief executive officer, respectively.  Moreover, Blink's allegations are of interdependent and concerted conduct by both the non-signatory – Hippo – and the signatories – Jacoby and Kakaulin – to the Settlement Agreements.  *E.g.*, *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (citing Eleventh Circuit decision approvingly for proposition that "[a]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.") (internal quotation marks and citation omitted); *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 75 n.6 (S.D.N.Y. 2012) (Engelmayer, J.) (agreeing that plaintiffs would be estopped from refusing to arbitrate dispute with non-signatory, "given the Amended Complaint's pervasive allegations of interdependent and coordinated misconduct between nonsignatories and signatory").[4]

Further, Blink's tactics – its filing of a federal court complaint that is substantively identical to a state court complaint that it withdrew, including as to Hippo, following Justice Sherwood's "encouragement" – highlight the procedural gamesmanship motivating Blink's efforts to avoid arbitration.  Blink is not a non-signatory being forced to agree to something – arbitration – to which it is not bound.  It is a signatory that freely bound itself to arbitrate future disputes with Jacoby and Kakaulin, and that now seeks to evade arbitration by camouflaging that dispute as being one with Hippo.  Under these circumstances, it would be highly inequitable to allow Blink to avoid arbitration of its claims against Hippo.

---

[4]  *GATX Management Services, LLC v. Weakland*, 171 F. Supp. 2d 1159 (D. Colo. 2001), which likewise applied an "intertwined claims" analysis, is highly illustrative of that point even if it is outside this circuit.  There, a non-signatory corporate defendant sought to compel arbitration of claims against it, for misappropriating trade secrets and inducing breach of an employment contract, based on the arbitration clause in its new employee's employment agreement with the plaintiff company, his former employer.  The court found that the claims against the corporate defendant derived from the employment agreement, stating that if the employee had not been employed by plaintiff, he would not have had access to plaintiff's alleged trade secrets, and the defendant company would have had no alleged trade secrets to misuse.  *Id.* at 1166-67 (applying similar rationale to inducing breach of contract claim).  The court further found that the claims against the corporate defendant, which were also asserted against the individual, involved allegations of "substantially interdependent and concerted misconduct."  *Id.* at 1167.  Those claims were deemed "inherently inseparable," since the crux of the complaint was that "[the defendant company] allegedly induced breach of contract and misappropriated trade secrets because of the conduct of [the individual defendant]."  *Id*.  Based on these circumstances, the court "conclude[d] that the 'intertwined-claims' equitable estoppel doctrine should apply and [the company defendant] may compel arbitration of the claims against it."  *Id*.  The same logic applies to Blink's claims here.

Case 1:18-cv-02258-PKC   Document 16   Filed 03/30/18   Page 10 of 10



Page 10

      Considerations of judicial economy further dictate that Blink's claims against Hippo be arbitrated. *Flightdocs, Inc. v. Jackson*, Civ.A.04-CV-4840 DGT, 2005 WL 2038588 (E.D.N.Y. Aug. 23, 2005) (Trager, J.), in which non-signatory defendants sought to compel arbitration of tortious interference claims against them, is closely on point. There, the court found that those claims were intertwined with claims that had been asserted against the signatory defendant in a pending arbitration, since without a showing in the arbitration that that defendant had breached the relevant contract, plaintiff could not establish its tortious interference claims against the non-signatory defendants. *Id.* at *6. The court then emphasized that it was "necessary to consider the great policy considerations of judicial economy and avoidance of confusion and inconsistent results in support of granting a [motion to compel arbitration] where common questions of law and fact are likely to be determined in arbitration." *Id.* at *7 (alteration in original). The court accordingly held that the signatory plaintiff "is estopped from resisting arbitration." *Id*.

      Those same considerations of judicial economy apply here. Blink's claims against Hippo raise the same issues present in the arbitration against Blink. For that reason, as noted, the arbitration will almost certainly resolve all issues that are otherwise present in this case, and in accordance with principles of res judicata and collateral estoppel, that resolution will be binding on Blink in this case and almost surely obviate the need for any post-arbitration proceedings.

      In sum, Blink's claims against Hippo all derive from and are inextricably intertwined with alleged misdeeds by Jacoby and Kakaulin that are encompassed by the arbitration clauses in the Settlement Agreements and are the focus of the arbitration against Blink. Blink is therefore estopped from evading arbitration of those claims, a conclusion reinforced by considerations of judicial economy.

*   *   *

      We thank the Court for its consideration and look forward to appearing for a conference, preferably in person, at the Court's earliest convenience.

      Respectfully yours,

      /s/Steven M. Kayman
      Steven M. Kayman

cc:    All Counsel of Record (by ECF)