I5EAABLIC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BLINK HEALTH LTD.,

4                   Plaintiff,

5            v.                          18 CV 2258 (PKC)

6   HIPPO TECHNOLOGIES LLC,

7                   Defendant.

8   ------------------------------x
                                         New York, N.Y.
9                                        May 14, 2018
                                         11:45 a.m.
10
    Before:
11
                        HON. P. KEVIN CASTEL,
12
                                         District Judge
13
                             APPEARANCES
14
    GIBSON, DUNN & CRUTCHER, LLP
15       Attorneys for Plaintiff Blink
    BY:  ORIN SNYDER
16  ANGELIQUE KAOUNIS
    BABAK GHAFARZADE
17
    PROSKAUER ROSE, LLP
18       Attorneys for Defendant Hippo
    BY:  STEVEN M. KAYMAN
19  STEVEN B. FEIGENBAUM

20

21

22

23

24

25

I5EAABLIC                          Conference

```
 1            THE COURT:  Please be seated.

 2            (Case called)

 3            MR. SNYDER:  Good morning, your Honor, Orin Snyder,

 4    for the plaintiff.

 5            THE COURT:  All right.  Good morning, Mr. Snyder.

 6            MS.KAOUNIS:  Good morning, your Honor.

 7            Angelique Kaounis, for plaintiff.

 8            THE COURT:  Thank you.

 9            MR. GHAFARZADE:  Good morning, your Honor.

10            Babak Ghafarzade, for the plaintiff.

11            THE COURT:  Let me see if I can get your name

12    correctly.  Say it again if you will.

13            MR. GHAFARZADE:  Babak Ghafarzade.

14            THE COURT:  I'm sorry.  I didn't have it on the docket

15    sheet.

16            MR. GHAFARZADE:  I filed a notice of appearance this

17    morning.

18            THE COURT:  OK.  "Ghafarzade".  Say it again.

19            MR. GHAFARZADE:  "Ghafarzade".

20            THE COURT:  "Ghafarzade".  Thank you.

21            For the defendant?

22            MR. KAYMAN:  Steven Kayman, Proskauer.

23            THE COURT:  All right.

24            MR. FEIGENBAUM:  Steven Feigenbaum, Levi Lubarsky

25    Feigenbaum & Weiss.
```

I5EAABLIC                          Conference

```
 1              THE COURT:  All right.  Thank you all for coming in.
 2              Let me ask Mr. Kayman with regard to Hippo
 3   Technologies LLC, who are the members of the LLC?
 4              MR. KAYMAN:  I'm not certain, your Honor.  I believe
 5   that they are trusts that are beneficially owned or controlled
 6   by the two founders of Hippo Technologies, Mr. Jacobi and
 7   Mr. Kakaulin.
 8              THE COURT:  All right.  And when did Hippo, the LLC
 9   come into existence?
10              MR. KAYMAN:  Again, I'm not exactly certain, your
11   Honor, but I believe it was in the early part of 2017.
12   Perhaps, February but I can't be sure of that.  We can
13   certainly get that information for your Honor.
14              THE COURT:  All right.  And what does it mean to be an
15   LLC?  This is an LLC formed under the law of what jurisdiction?
16              MR. KAYMAN:  Delaware, your Honor.
17              THE COURT:  All right.  What does it mean to be an
18   LLC?  I know what a corporation is.  I know what partnership
19   is.  I know an LLC is not a corporation.  It's a membership
20   entity.  What does that mean?
21              MR. KAYMAN:  It's a limited liability corporation,
22   your Honor.
23              THE COURT:  You'd better check on that.  Are you sure
24   it's a limited liability corporation or a limited liability
25   company?
```

I5EAABLIC                    Conference

1        MR. KAYMAN:  You're right, your Honor.  Limited

2   liability company.

3        THE COURT:  There's a big distinction.  So for can

4   diversity jurisdiction purposes, for example, if it's a

5   corporation we look to the principle place of business and its

6   state of organization.  We don't do that for an LLC.

7        MR. KAYMAN:  Same as partnership, absolutely.

8        THE COURT:  Exactly.  So is it the same as a

9   partnership in other respects?  That's what I am trying to get

10  to the bottom of.

11        MR. KAYMAN:  I think it's a hybrid is my understand, a

12  high level, your Honor.  I'm not a corporate lawyer but I think

13  that most people who are somewhat but not heavily versed in

14  these matters would view it as a sort of hybrid between a

15  partnership and a corporation.

16        THE COURT:  OK.  All right.  Thank you.

17        Let me hear from the movant and then I'll hear back

18  from you in response if that works for you.

19        MR. KAYMAN:  I think I'm the movant.

20        THE COURT:  Oh, you are the movant, so go ahead.

21        MR. KAYMAN:  This is on the motion to compel

22  arbitration, your Honor.

23        THE COURT:  Yes.

24        MR. KAYMAN:  Thank you very much, your Honor.

25        I'll be very brief because I think our papers have set

1   out the gist of our position.  I know your Honor has looked at

2   them.  I was in front of you back in October for another motion

3   to compel arbitration.

4           There are four points that I think dictate the result

5   here and they dictate the result even if the other side, Blink,

6   is right in all of its legal arguments.  Those four points

7   are -- and I don't think they're right in all their legal

8   arguments, let me be clear -- number one, there is no dispute

9   that Blink is required to arbitrate the claims asserted by the

10  founders of Hippo, Mr. Jacobi and Mr. Kakaulin.  So the

11  arbitration is going forward.

12          Number two, there is no doubt that the issues in the

13  arbitration substantially -- and I would say very

14  substantially -- overlap with the issues in this lawsuit.

15          Number three, there is every reason to believe that

16  the outcome of the arbitration will determine through res

17  judicata most and probably all of the issues in this case.

18          Therefore, and number four, it's basic law that when

19  there's overlap between an arbitration and a lawsuit the

20  arbitration should go first to avoid inconsistent results, the

21  risk of inconsistent results, to increase efficiency and to

22  validate the parties' agreement to arbitrate.

23          THE COURT:  Let me ask you the specific relief that

24  you seek on your motion.

25          MR. KAYMAN:  To stay this case pending the

1   arbitration.

2            THE COURT:  OK.

3            MR. KAYMAN:  We don't think that under the FAA

4   dismissal is appropriate.  I think that at the end of the day

5   this case is likely to get dismissed after the arbitration but

6   as we read the law, the Court is if not required, strongly

7   mandated to stay it rather than dismiss it.  If your Honor

8   agrees with us that the arbitration should go first as I hope

9   your Honor will, so that is the relief we seek to stay this

10  case pending the arbitration.

11           THE COURT:  What is the status of the arbitration?

12           MR. KAYMAN:  The quick update, your Honor, is that we

13  now have an arbitrator, Honorable Carol Heckman, a former

14  federal magistrate judge from Buffalo who was appointed just

15  last week as the arbitrator.  And both sides have, we of

16  course, submitted a statement of claims and Blink has put in

17  opposition answer reservation of rights challenge to the way in

18  which the proceeding is being held based on employment versus

19  commercial rules and some other technical issues, but they do

20  not can challenge the arbitration going forward.

21           THE COURT:  Now, let me ask you, what relief do you

22  seek in the arbitration?

23           MR. KAYMAN:  A variety of different forms of relief,

24  your Honor.  But most pertinent to the issue before the Court

25  today we seek a declaration that A, there are no trade secrets

1   that Blink possesses that are B, in use by Hippo or the two

2   principles of Hippo.  So we seek a declaration that there has

3   been no trade secret misappropriation which obviously is the

4   heart of this case.

5              THE COURT:  OK.  Let me hear from the non movants.

6              MR. SNYDER:  Yes.  Thank you, your Honor.

7         and I appreciate the earlier questions through

8   Mr. Kayman because I think they're both dispositive of the

9   motion here.

10             Of course arbitration is favored in federal court and

11  is a strong and local policy favoring it but only when the

12  plaintiff here has agreed to arbitrate and of course, we agreed

13  to arbitrate limited issues limited in time against two of the

14  many individuals who conspired to steal our trade secrets.

15             THE COURT:  What do you mean by "limited in time"?

16             MR. SNYDER:  Well, the two wrongdoers or alleged

17  wrongdoers who were implicated in our complaint but non named

18  as defendants signed settlement agreements with Blink that only

19  protected them or only governed their conduct through for one

20  of them January of 2017 and the other, February 2017.  The acts

21  alleged in the complaint by my client, Blink, commenced and

22  embraced alleged wrongdoing later in 2017.  For example --

23             THE COURT:  They commenced later in 2017; is that what

24  you say?

25             MR. SNYDER:  Well, we don't know and we'll only know

I5EAABLIC                          Conference

1    through discovery when they actually formed a company but we

2    know that two months after each signed settlement agreements

3    with us, they filed applications with the U.S. Patent and

4    Trademark Office to trademark the name "Hippo" and they

5    described it in way that was suggestive of theft.  And then in

6    the months --

7             THE COURT:  They did it when?

8             MR. SNYDER:  Yes, sir.  In April of 2017, April 19.

9    And then we go on to explain that the defendant company acting

10   through its many officers and agents --

11            THE COURT:  Just back up.  You're saying after

12   February 2017 Jacobi and Kakaulin had no obligations to you

13   under the NDA.

14            Is that what you are saying?

15            MR. SNYDER:  No.  What I'm saying is that they're not,

16   that the agreement only involved released conduct before those

17   dates.  They didn't got a free pass and immunity after those

18   dates and therefore, we would contend that any wrongdoing

19   thereafter -- for example, if they burned down our building

20   and/or committed an assault and battery we would be able to sue

21   them in a court.  We would not have to arbitrate those post

22   release acts.

23            And in fact one of the major allegations in the

24   complaints occurs in February of 2018, more than a year after

25   Jacobi or Kakaulin signed their release documents where they

I5EAABLIC                    Conference

1  sought our marketing playbook which is our crown jewel

2  documents.  So this is, your Honor, a trade secret theft

3  lawsuit against the corporation, Hippo, with respect to which

4  we never entered into any agreement much less agreed to

5  arbitrate

6         THE COURT:  I'm going to let you each sum up any which

7  way you want but I am trying to understand.  So some things

8  you'll just have to bear with me on.  And feel free,

9  Ms. Kaounis is welcomed to respond directly to any inquiry.

10  There is no rule.

11         Are you member of the bar of this court?

12         MS. KAOUNIS:  I have been admitted pro hac vice.

13         THE COURT:  Wonderful.  So you are permitted to

14  respond as well.

15         What I'm trying to understand was your reference to

16  the timeframe and these claims being outside of the timeframe

17  governed by the nondisclosure agreement.

18         MR. SNYDER:  I can explain that directly.  So the

19  parties had various disputes.  They settled those disputes,

20  entered into written settlement agreement.  That settlement

21  agreement contained and arbitration agreement.  The disputes

22  that were settled involved conduct that predated both January

23  31, '17 with the Kakaulin and February 5, '17 for Jacobi,

24  meaning to say we only agreed to arbitrate to the extent that

25  they were in violation of their ongoing obligations under the

I5EAABLIC                    Conference

1    settlement agreement.  We did not immunize them or agreed to

2    arbitrate in the event they committed torts in the future in

3    conspiracy with others and on behalf of a corporation.

4              THE COURT:  Where was the nondisclosure provision

5    contained?

6              MR. SNYDER:  The NDAs are stand-alone agreements and

7    continue to obligate them not to use our trade secret.

8              THE COURT:  When were entered into?

9              MS.KAOUNIS:  During the employment.

10             MR. SNYDER:  2016 or so.

11             THE COURT:  And then there is a settlement agreement

12   that is entered into when?

13             MR. SNYDER:  With respect to Mr. Jacobi who is in the

14   courtroom February 5, 2017 with Mr. Kakaulin January 31, 2017.

15   And then we allege in our complaint of course a conspiracy that

16   goes way outside those dates and continues to the present and

17   frankly gains its steam or momentum in 2017 or early '18 and

18   includes today and includes many others who has no agreements

19   with us, much less agreements to arbitrate.

20             THE COURT:  One moment.

21             All right.  So here is the presenting question.

22   There's a settlement agreement and mutual release.  I'm looking

23   at the Kakaulin one.  I know that the Jacobi one has different

24   language in it.  I have that also in front of me.  And what I'm

25   looking at are Exhibits C and D to the Fiegenbaum declaration.

1          MR. SNYDER:  Yes, your Honor.

2          THE COURT:  And what I see here is a document that

3    doesn't tell me what the terms of the agreement are, but then

4    I'm being asked to decide -- and this may be part of your

5    position as the non movant -- but I'm being asked to decide

6    whether the present dispute arises out of or relates to the

7    agreement.  That's the language in I think Jacobi and in the

8    second one.  Maybe I have them flipped.  Jacobi says:

9          "Any dispute regarding this agreement"

10          And Kakaulin says:

11          "Any dispute or controversy arising out of or relating

12    to this agreement."

13          And you say that has nothing to do with an NDA.  It

14    has to do with the scope of a release.  Is that what you are

15    representing to me, that the only thing that is covered within

16    these two settlement agreements are the terms of the release?

17          MR. SNYDER:  No, your Honor.

18          THE COURT:  And what claims are extinguished and what

19    consideration is being paid to anybody who is being released?

20          MR. SNYDER:  No, your Honor.

21          THE COURT:  Then what is the agreement -- let me not

22    yell at you.  Let me yell at -- when I say "yell", I mean that

23    colloquially.

24          Mr. Kayman, how am I supposed to decide whether this

25    dispute relates to the agreement if I don't know what the

1   agreement says?

2          MR. KAYMAN:  I apologize if we aren't clear, your

3   Honor.  Both agreements expressly incorporate the underlying

4   NDA.

5          THE COURT:  Where?  Because I have the agreements in

6   front of me.  Tell me which paragraph I should look at.

7          MR. KAYMAN:  If your Honor looks at Jacobi settlement

8   agreement, page three, paragraph 5A.

9          THE COURT:  Hang on a second because what I have looks

10   like this, a blank page.

11          MR. FEIGENBAUM:  Your Honor, I have with me

12   un-redacted version of both agreements, if your Honor would

13   like to see them.

14          THE COURT:  Here is the question.  Were un-redacted

15   versions filed?

16          MR. KAYMAN:  No, your Honor, because there are

17   confidentiality provisions in the settlement agreement, so we

18   only filed redacted versions.  We filed those sections that

19   pertain to the arbitration provisions.  We didn't file one

20   pertaining to the NDAs.

21          MR. FEIGENBAUM:  No.  The only thing that was filed

22   publicly was arbitration provisions.  Frankly, your Honor, we

23   didn't think there would be a dispute.

24          THE COURT:  Well, when you say the only thing that was

25   filed publicly what was filed not publicly, did you submit an

1    order to the Court asking to seal something?

2               MR. FEIGENBAUM:  We did not.

3               THE COURT:  So when you say the only thing that was

4    filed publicly, the only thing that was filed anywhere given to

5    the Court in any way, shape or form was the redacted version.

6               MR. FEIGENBAUM:  Was the arbitration version.

7               THE COURT:  No.  No.  The redacted version of the

8    agreement.

9               MR. KAYMAN:  The redacted version.

10              THE COURT:  Excuse me.  Excuse me.  Is that a "yes" or

11   is that a "no"?

12              MR. FEIGENBAUM:  No.  That's correct.

13              THE COURT:  Thank you.

14              MR. KAYMAN:  I was just going to add, your Honor, we

15   did quote the relevant provisions of the settlement agreement

16   including the incorporation of the NDA in our brief and perhaps

17   we should have submitted these in camera or made a motion for

18   sealing.  We didn't frankly expect on argument.

19              THE COURT:  You are shocked that somebody's opposing

20   your motion.  I got it.

21              MR. KAYMAN:  We knew they were going to oppose the

22   motion but we were trying to comply with the niceties and if we

23   got it wrong, we apologize.

24              THE COURT:  It's not a question of getting it wrong.

25   It's a question of you're trying to persuade a judge that this

I5EAABLIC                    Conference

1    falls within the four corners of an agreement that says any

2    dispute regarded, related or concerning --

3              MR. KAYMAN:  Correct.

4              THE COURT:  -- the settlement and release.

5              MR. KAYMAN:  Correct.

6              THE COURT:  And why I could certainly understand if it

7    was some provision in there that was top secret and nobody

8    wanted the Court to know about it, that might be one thing.  We

9    might have a little discussion about that today, but it at

10   least I would have some way of knowing whether the dispute is

11   within the scope of the settlement agreement and release.  I

12   literally have no way of knowing.

13             MR. KAYMAN:  We apologize, your Honor.

14             May we hand up the two un-redacted agreements?

15             THE COURT:  I think it's a really good idea and then

16   maybe I'll have some idea of what everybody's talking about.

17             MR. KAYMAN:  I think I could guide the Court.

18             THE COURT:  Have you shown it to opposing counsel

19   before you show it to me?

20             MR. KAYMAN:  Of course.

21             (Pause)

22             THE COURT:  OK.  I'm going to have marked as Exhibit A

23   is the Jacobi, Court Exhibit B the Kakaulin.

24             (Pause)

25             THE COURT:  So what provision -- start with Jacobi --

1    do you contend is at issue in the arbitration?

2              MR. KAYMAN:  Yes, your Honor.  Page three paragraph 5A

3    headed confidentiality and intellectual property assignment.

4              THE COURT:  Hang on a second.  Page three, 5A.  Thank

5    you.

6              MR. KAYMAN:  Yes, your Honor.

7              THE COURT:  Go ahead.

8              MR. KAYMAN:  It says employee reaffirms and

9    acknowledges that he remains bound by the provisions of that

10   certain confidentiality assignment of the mentioned non

11   competition and non-solicitation agreement executed by employee

12   in the company on July 31, 2015, the NDA.  And we also --

13             THE COURT:  An employee further affirms and

14   acknowledges that the provisions of the NDA shall remain

15   binding upon him except that the scope of the non competition

16   clause in the NDA is modified only to prohibit employees from

17   and then it describes certain things.

18             MR. KAYMAN:  And to call an agreement, if your Honor

19   would be so kind as to turn to page seven and specifically, to

20   paragraph 13 which is headed "prior agreements", it states:

21             "Except as may be otherwise modified in this agreement

22   the call-in agrees that he shall remain bound in all respects

23   by of the allegations set forth in paragraph one which is

24   headed "confidentiality" and paragraph four and five non

25   solicitation of customers and non solicitation of employees of

1   the confidentiality assignment -- solicitation agreement signed

2   by Kakaulin on August 11, 2015.

3           THE COURT:  All right.  The lead-in is except as may

4   be otherwise modified in this agreement which may or may not

5   have some significance here.  So tell me why this dispute falls

6   within the terms of the settlement agreement and mutual

7   release.

8           MR. KAYMAN:  Absolutely, your Honor.  So I think it is

9   best like so many things done through an illustration.  A

10  picture is worth a thousand words and all that.  In the state

11  court case Blink sued the individuals, Jacobi and Kakaulin and

12  also Hippo and asserted essentially the same claims being

13  asserted here that the company was a sham, that it's a copycat,

14  that it's founded on theft of Blink's trade secrets, et set.

15          In this case after getting escorted out shall we say

16  of state court, they tried to be a little more clever.  They

17  just dropped the individuals.  But the claims are fundamentally

18  the same.  They are essentially, that Blink came up with all

19  these wonderful ideas which are supposedly secret that the

20  individuals from working at Blink learned the secret sauce and

21  have now taken the secret sauce and used it to create Hippo.

22  And all they do is they blame Hippo instead of the few

23  individuals to the extent they can and they bring in some lower

24  level people and try to make them responsible.

25          It's as Justice Sherwood said.  It's an attempt to

1    plead around the arbitration obligations.  When those

2    obligations to arbitrate are broad, obvious and directly

3    implicated by the core of the complaint in this case, which is

4    that Hippo through individuals, these two, Mr. Jacobi is right

5    there and Mr. Kakaulin and some lower level people, one of whom

6    didn't even work for Hippo supposedly stole Blink's trade

7    secrets.

8            THE COURT:  But a key link in your argument is that

9    these two agreements, the separation or settlement agreement

10   shall be construed as incorporating an arbitration mechanism

11   for any future dispute over the NDA.  That's your position?

12           MR. KAYMAN:  That's fair.  And I think that might be

13   right, your Honor, it says thou shalt now use Blink's

14   confidential information in so many words.

15           THE COURT:  Well, no.  Let's be accurate and let's be

16   fair.  I suspect the NDA may say that but these agreements

17   reaffirm that the NDAs remain binding.  They don't have within

18   them in an independent confidentiality requirement.  They

19   reaffirm that the agreements are binding.

20           MR. KAYMAN:  I agree with what you just said, your

21   Honor.  Although, they do contain return document provisions,

22   they've touched on confidentiality, but you're right.  The

23   confidentiality obligation itself --

24           THE COURT:  But you are not standing before me and

25   saying the return of document issue is what the arbitration is

1     about and that didn't exist in the NDA.  It only exists in this

2     group.  That's not your argument.

3             MR. KAYMAN:  No.  That's correct, your Honor.  And we

4     would have the NDAs if your Honor wants to see them.  They are

5     saying exactly what you would expect them to say.

6             THE COURT:  I should have them.

7             MR. FEIGENBAUM:  Your Honor, they were introduced in

8     plaintiff's opposition.

9             THE COURT:  They are in the record?

10            MR. FEIGENBAUM:  Yes.  But if your Honor would like --

11            THE COURT:  If they're on the record on the motion,

12    that's the only question I have had.

13            Let me here from Blink's counsel.

14            MR. SNYDER:  Yes, your Honor.

15            This is not a dispute that arises under the NDA or the

16    settlement agreement.  This is obviously a dispute about trade

17    secrets that we say are protected by federal law and we're in

18    fact alleging a broader conspiracy that involves acquiring

19    trade secrets from other individuals, not these two individuals

20    who were attempting to misappropriate trade secrets that are

21    not connected in any way to these two individuals.  We're

22    alleging a broad conspiracy that involves a period with our

23    economic relationships having nothing to with these two

24    individuals.

25            And of course as your Honor noted, the complaint

I5EAABLIC                    Conference

1   focuses on actions that took place largely after these two

2   agreements were signed.  For instance, a orchestrating meetings

3   between a current Blink employee and a third party to steal our

4   marketing playbook in 2018.

5          So we're not seeking to hold these two individuals

6   accountable --

7          THE COURT:  They are not a party, correct?

8          MR. SNYDER:  Correct.

9          THE COURT:  I got that message.  I knew that before

10  you showed up this morning.

11         MR. SNYDER:  I'm being repetitive.  I'm beating a dead

12  hoarse.

13         THE COURT:  It's not a question of being repetitive.

14  I understand the procedural history of how you all wound up in

15  my courtroom here.  I got that.  You sued them initially and in

16  this lawsuit you dropped them.

17         MR. SNYDER:  Yes, your Honor.  What we're saying is as

18  a matter of contract law and the jurisprudence around

19  arguability of these kinds of disputes, we never contemplated

20  nor do the parties intend but agreed to arbitrate against these

21  two individuals for matters that with respect to Jacobi regard

22  the agreement and with regard to the other one arise out of or

23  relate to that that would mean that we have a perpetual

24  obligation to arbitrate against a company that is later formed

25  and conspired with a whole range of different individuals,

1    including these two, to try to destroy our company.

2              That is not what this agreement says.  That is not

3    what the law says.  It says that when you want to hold a --

4    when you want to force an arbitration provision against a third

5    party it's only limited circumstances if the Second Circuit

6    says that's OK and either of those circumstances applies here

7              THE COURT:  I understand that and if that becomes

8    necessary we can talk about it.  But if I heard correctly this

9    morning, I heard that Hippo doesn't claim here and now that

10   there's any obligation on the part of Blink to arbitrate with

11   them.

12             I heard this morning something very different, that

13   the relief they're seeking does not include an application to

14   compel Blink to arbitrate with anyone.

15             MR. SNYDER:  Yes, your Honor.  It seems they're

16   seeking to stay, not dismiss.  That's correct.

17             THE COURT:  So you stood before me moments ago -- we

18   have a transcript -- and I think you were arguing to me that

19   when your client signed the agreement they never imagined that

20   they were agreeing to a perpetual agreement to arbitrate with

21   an entity that had never been formed.  And then you proceeded

22   to launch into a discussion of Second Circuit case law on

23   arbitration with non-signatories.  But that's not what this

24   motion is about.

25             MR. SNYDER:  As to the stay, your Honor, I also think

1    that we are entitled to our day in court today, not some future

2    date.

3                THE COURT:  OK.  That's a different story.  That's a

4    different story.  But this motion as I've come to understand is

5    not whether under the Contech case and other cases there is

6    equitable estoppel or sufficient relationship to hold a

7    non-signatory to an arbitration agreement.  That's not been

8    before me on this application, correct?

9                MR. SNYDER:  That seems to be the case.

10               THE COURT:  So let's talk about this.

11               MR. KAYMAN:  I think Mr. Kayman has it backward.  In

12   terms of res judicata I believe that resolution of the

13   arbitration is going to resolve the material issues in this

14   case which is whether the federal statutes governing trade

15   secret misappropriation were breached or not.  They may be

16   seeking a declaration that the individuals didn't violate the

17   law but I don't think that is going to be dispositive of all

18   the material issues in this case because the issues in this

19   case extend way beyond the conduct of these two individuals.

20   And the arbitration --

21               THE COURT:  Wait a minute.  You have to think for a

22   minute about where a judge stands in a matter like this.

23               Look at me for a minute instead of reading.

24               MR. SNYDER:  Yes, your Honor.

25               THE COURT:  You want to read?

I5EAABLIC                    Conference

1                   MR. SNYDER:  No, your Honor.

2                   THE COURT:  We'll give you a recess.  Read your paper.

3       We'll be back in five minutes.

4                   MR. SNYDER:  Your Honor, I apologize.

5                   THE COURT:  That's all right.  That's good.  Just read

6       your papers.  I'll be back in five minutes.

7                   (Recess)

8                   THE COURT:  All right.  You may continue, sir.

9                   MR. SNYDER:  Yes, your Honor.  Thank you.

10                  And I apologize for not looking at your Honor while

11      you were speaking.

12                  Your Honor, if you look at the arbitration demand and

13      compare it to the complaint, they're very fundamentally

14      different pleadings.  The complaint is much broader.  It

15      implicates conduct that is not at issue in the settlement

16      agreement.  It implicates conduct of three alleged former Blink

17      insiders not subject to any arbitration agreements Simanoff,

18      Tanenbaum and Trepanier and they're alleged to have been part

19      and parcel of and really at the center of this conspiracy.

20                  And what you'll see from the arbitration demand is

21      that they seek a declaration that Hippo didn't violate any

22      trade secrets but as a preliminary matter we would contend that

23      the arbitrator cannot consider a declaratory judgment claim

24      against Hippo because it falls outside the scope of the

25      settlement agreement which concerned Jacobi and Kakaulin's

I5EAABLIC                    Conference

1    employment.  But even if it could again, as I said, our lawsuit

2    implicates conduct that is not at issue in the arbitration, a

3    result that the arbitration by definition therefore could not

4    resolve.

5            To the contrary we believe that it would be more

6    efficient to have this proceeding occur first and stay the

7    arbitration because all of the issues decided here would be

8    dispositive of and have estoppel effect in the arbitration.

9    For example, your Honor, in the arbitration they allege that

10   our filing of this federal lawsuit constitutes an abusive

11   process that by filing this federal lawsuit we committed a

12   wrong.  Of course that can't be determined until this lawsuit

13   proceeds and your Honor or a jury or an appellate court rules

14   on the sufficiency of that lawsuit which we believe is

15   substantial.

16           So while your Honor I understand is in a dilemma

17   because on the one hand you're being confronted by the

18   defendant that the arbitration is most efficient deficient and

19   we're contending that this is most efficient, I believe that a

20   simple comparison the two pleadings would demonstrate that

21   arbitration and then this lawsuit would actually create

22   inefficiencies.  And Hippo has not shown that the arbitration

23   will actually dispose of any material action in this lawsuit.

24           And for example, your Honor, if you look at the

25   complaint, paragraphs 59 to 73 we recount in some detail how

1    Hippo and others acquired trade secrets from individuals other

2    than these two, that these are the issues won't being

3    confronted litigated in the arbitration.  There's another point

4    which is a due process point and a res judicata point.

5            While in some instances a private arbitration can have

6    res judicata effect, in a federal lawsuit it's not automatic

7    and it depends on many factors including how much discovery is

8    allowed in the arbitration.  And so even if the arbitrator

9    would permit a declaratory judgment claim against Hippo which I

10   think is farfetched, we are not going to have to the kind of

11   discovery document and deposition discovery that the Federal

12   Rules of Civil Procedure afford us in this court and so we

13   would be before your Honor saying whatever the outcome of this

14   arbitration we need a shot here against Hippo because we have

15   that right as a matter of federal law under the Federal Trade

16   Secret Act, this Court's diversity jurisdiction and otherwise

17   to litigate those claims here.

18           And so in sum, while clearly there is a relationship

19   between the two proceedings obviously and clearly, there is

20   overlap of facts, the test is not whether facts overlap.  The

21   test is whether A, a stay here is appropriate and B, whether

22   under this court's inherent powers the Court should stay these

23   proceedings.

24           Now, Hippo cites FAA Section Three as a ground for

25   seeking a stay of this action.  And that section is not

1    applicable because Hippo is not a signatory to the arbitration

2    agreements.  And so second, your Honor, again, the issue here

3    is not are there issues that overlap.  The issue is whether the

4    issues that will be finally determined by the mediator, by the

5    arbitrator, whether the issues that will be finally determined

6    by the arbitrator will be dispositive of the issues here.  And

7    because the complaint in our action attributes misconduct to

8    Hippo as a corporate entity that has nothing to do with

9    settlement agreement and individuals who have are signatories

10   to the settlement agreement, this action will move forward

11   irrespective of the arbitrator's decision on whatever issue the

12   arbitrators chooses to decide.

13          So we would respectfully submit that we be entitled to

14   proceed here and we will be asking the arbitrator to stay her

15   proceeding to allow this lawsuit to proceed if your Honor

16   allows it.

17          Now in terms of which case IS more advanced, they're

18   about the same starting line.  We have an arbitrator but we

19   haven't had any hearings or meetings with the arbitrator.  The

20   parties haven't met and conferred about discovery.  I imagine

21   they are going to resist in an arbitration the kind of robust

22   discovery that we would want in this lawsuit.  And in a trade

23   suit case there is certain discovery that is essential.  I'm

24   not saying we're going to want to depose the world, we are

25   going to want to take a number of third party and party

1    depositions and in my experience arbitrators are generally

2    hostile to that kind of discovery.  We are going to want some

3    kind forensic examination of electronic equipment.  And I just

4    think that we're going to be hamstrung in an arbitration and

5    even if we're entitled to some discovery, the issues are going

6    to not overlap and we're going to be back here litigating this

7    case in earnest.

8            So we would respectfully submit that the defendant has

9    not yet its burden to show that a stay is appropriate or in the

10   interest of justice.  This is not one of these cases where

11   there's complete overlap of claims and each side is raising to

12   its preferred forum.  Again, there is a reference made to

13   state, federal court arbitration.  We want to get to the truth

14   which means we need as much discovery as is reasonable to

15   determine who was involved and that's going to require

16   subpoenas to third parties.  We may need to go to other

17   jurisdictions and get nonparty subpoenas under Rule 45 and

18   certainly that won't be available to me in arbitration as well.

19           So for all those reasons, your Honor, we respectfully

20   request that this Court deny the motion to stay and set a

21   discovery schedule.  We're prepared to conduct discovery in a

22   reasonable amount of time.  I think the parties agreed to 120

23   days and most of the other parameters of the discovery.  We're

24   not looking to drag this out.  We just want to get to the facts

25   and then present them to the Court for resolution and then I

I5EAABLIC                    Conference

1   don't think there'll be anything left to arbitrate because the

2   underlying issues here are dispositive of the abuse of process

3   claims and of declaratory release claim and the final claims

4   are --

5        MS.KAOUNIS:  They have breaches of the settlement

6   agreement as well related to --

7        THE COURT:  Please stand when you are speaking and

8   speak so that the court reporter can hear you.

9        MS.KAOUNIS:  There are four claims that are going to

10  be basically resolved by this action.  The first is the

11  declaratory relief claim.  The second is the abuse of process

12  claim.  The third is bad faith under the DTA claim because that

13  has to show that there was no bad faith in filing of the action

14  and the fourth is the interference claim which is hinged off of

15  the same conduct.  So those four claims will be decided by what

16  happens in this action and they cannot be decided until this

17  action is resolved.

18        THE COURT:  Thank you.

19        MR. SNYDER:  I just wanted to apologize again for any

20  disrespect the Court interpreted.  I was simply scrambling to

21  read my notes and your question.  So I apologize.

22        THE COURT:  OK.  Thank you.

23        Let me hear from the movant.

24        MR. KAYMAN:  They very much, your Honor.

25        Actions speak than words.  They don't want to get at

1   the truth.  We offered to jointly retain an expert.  Early on

2   when Paul Weiss was -- he said look, let's hire an expert or

3   experts.  Let them look at what we're using and report to both

4   of us on whether there's any truth to these accusations.  They

5   flatly turned us down.

6           Again, actions speak louder than words.  Paul Weiss

7   respecting Blink at the time negotiated these settlement

8   agreements, proposed the arbitration provisions at the

9   beginning which were adopted virtually unchanged in the final

10  versions.  Those arbitration provisions have not been honored

11  by Blink.  There is no question that they have dishonored those

12  arbitration provisions, first by bringing state court action

13  and now by bringing this action.  The rules of the AA provide

14  for arbitration to be confidential, that their call-in

15  agreement specifically provide in many words for

16  confidentiality.  There is no question they've breached those

17  obligations, none.

18          So we're hearing a lot of words about how it's really

19  all the three low level people.  It's's really all Hippo.  It's

20  not Jacobi and Kakaulin.  That's just not credible.  They say

21  there is not complete overlap but, wow, this is inextricably

22  interwoven overlap if there ever way any.  There is a lot of

23  those.  And the only reason there isn't complete overlap is

24  because of clever pleading as Judge Sherman said.  Let me be

25  clear we're only asking for a stay and not a ruling on Hippo's

1    being subject to arbitrability because we think that's for the

2    arbitrator and we think the law is clear on that.

3                I totally disagree with all respect to my brethren

4    across the table that everybody wouldn't be bound by whatever

5    the arbitrator decides.  We all know that the ground for

6    appealing an arbitral ruling are extraordinarily limited.  And

7    allowing less discovery than they might want is not a ground.

8    It's only exceeding jurisdiction or taking bribes or something

9    really heinous and I don't know how much discovery they are

10   going to get.

11               THE COURT:  I think counselor's point is not that an

12   award wouldn't be enforceable but that an award may or may not

13   provide a grounds for issue preclusion in this action.  That's

14   a different issue than whether or not theres a ground to vacate

15   the award or ground to enforce the award.

16               MR. KAYMAN:  Fair, your Honor.  But again, actions

17   speak louder than word.  And if they really wanted to get at

18   the truth why don't they agree to arbitrate against Hippo and

19   that way there would be no question about it?  If trade secrets

20   are being used by Hippo, that's what they ought to be concerned

21   about.  And by trying to block a determination as to whether

22   Hippo is using trade secrets or not, I think that the intent is

23   obvious.  And it's obvious from those 11 subpoenas they served

24   in the state court action right after commencing it.  My client

25   is a start-up.  It's in the process of trying to strike deals

1   with business partners.  Blink's been around for a number of

2   years.  It's got a ton of money.  I think the public release

3   was 160 million and they're trying to put us out of business.

4   That's what's going on here.  And we want an arbitration, not

5   because we don't relish this process of having just determined

6   in this court but because it's quicker and cheaper and that's

7   the critical for us.

8            We've got to get this over so we can move on with our

9   business.  And importantly, your Honor, bring some competition

10  to this industry which is badly in need of it and lower

11  prescription drug prices to people who are badly in need of

12  that, and whether it's this court or an arbitrator, someone we

13  think is going to determine that the trade secrets are not in

14  use.  I think what we're going to pitch to the arbitrators

15  right of the bat is instead of each said having their own

16  experts, we'd like you, your Honor -- she's a former judge --

17  to commission your own expert and go in and look at what they

18  claim are trade secrets and have the expert report and whether

19  they are.  Go in and look at what we're doing and tell us

20  whether we're using any trade secrets.  We don't think we are.

21  But if we are, tell us and we'll stop.  We don't want to use

22  their trade secrets.  That can be accomplished in an

23  arbitration much more efficiently in the real world than in a

24  court.  You heard them.  They are going to be seeking subpoenas

25  on everybody in town.  And we don't have the money to fight

1    that battle.

2          So I think at a practical level and at a doctrinal

3    level because there is a strong federal policy favoring

4    arbitration, the right decision is to stay this case and to

5    find in favor of the arbitration.  And I think that from an

6    equitable standpoint, look at the way they behaved.  That cries

7    out for this Court to stay this case.

8          THE COURT:  Thank you.

9          MR. KAYMAN:  They've accomplished a large part of

10   their goal already by parading this in the public eye by having

11   all of our clients, potential investors and business partners

12   say, well, gee, how do I know this isn't going to go on forever

13   and cost a lot of money and drag me into it.  Nobody wants to

14   get dragged into a situation like that and that's why we have

15   to resolve it quickly and efficiently.

16         Thank you for hearing me out, your Honor.  Unless you

17   have any questions, I'll sit down

18         THE COURT:  All right.  Thank you.

19         The complaint in this action was filed on March 14,

20   2018.  It brings claims under the defense Defend Trade Secrets

21   Act, as well as very common law theories including

22   misappropriation of trade secrets, unfair competition, tortious

23   interfere with contracts and other common law claims against

24   Hippo Technology LLC, a limited liability company under the

25   laws of Delaware.

1           Shortly after the complaint was filed on April 6, 2018

2    Hippo Technologies LLC filed a motion seeking to compel

3    arbitration of all claims in the complaint brought by plaintiff

4    Blink.  That was the first requested relief.  Second, staying

5    this case pending the outcome of a related Triple A arbitration

6    brought by Hippo, Jacobi and Kakaulin against Blink and

7    granting such other and further relief as the Court deems just

8    and proper.

9           At argument today counsel made it plain, counsel for

10   Hippo, made it plain that it is withdrawing the motion insofar

11   as it seeks to compel arbitration of all claims in the

12   complaint brought by plaintiff Blink Health Limited.  So what

13   remains is the question of a stay.

14          Hippo was founded by Charles Jacobi and Eugene

15   Kakaulin, who are previously executives at Blink.  Jacobi

16   served as Blink general counsel and Kakaulin as Blink's vice

17   president and chief financial officer.

18          There was a non disclosure agreement that was signed

19   by the parties, by Jacobi and Kakaulin and Blink during the

20   period of Jacobi and Kakaulin's employment.  There was for

21   reasons that are somewhat extraneous, separate agreements

22   entered into by Jacobi and Kakaulin in or about the time that

23   they -- at least in the case of Jacobi -- in or about the time

24   he left the employment of Blink.  His agreement is dated

25   February 5, 2017.

1            And in the agreement Mr. Jacobi re-affirmed and

2    acknowledged that he remains bound by the provisions of the non

3    disclosure agreement and further affirms and acknowledges that

4    the provisions of the NDA shall remain binding upon him with

5    certain modifications that are set forth.

6            Thereafter, the agreement contains an arbitration

7    provision which provides at paragraph 15 any dispute regarding

8    this agreement cannot be resolved by negotiations between

9    employee and the company shall be submitted to and solely

10   determined by binding arbitration conducted by the employment

11   rules of the Triple A, and the parties agreeing to be bound.

12   Mr. Jacobi's agreement says all questions regarding whether or

13   not a dispute is subject to arbitration will be resolved by the

14   arbitrator.

15           I have not quoted the full text of the arbitration in

16   this bench ruling.

17           With regard to Mr. Kakaulins who was as noted also a

18   signatory of NDAs, his agreement with the company was dated

19   January 31, 2017 and it's styled as a settlement agreement and

20   mutual release.

21           It too contained a provision re-affirming the

22   enforceability of the confidentiality, assignment of

23   inventions, non competition and non solicitation agreement that

24   had been signed by him on August 11, 2015.  And in fact it

25   says:

1          Except as may be otherwise modified in this agreement
2     Kakaulin agrees that he shall remain bound in all respects by
3     all of the obligations set forth in paragraphs one, four and
4     five of the referenced agreement.
5          This agreement provides that any dispute or
6     controversy arising out of or relating to this agreement,
7     including any claims under statute law or regulation between
8     Kakaulin on the one hand and the Blink parties or any of their
9     respective officers, directors or employees on the other hand,
10    shall be resolved exclusively by arbitration.
11         Again, I'm not reading the agreement in full.
12         And there is an arbitration proceeding pending before
13    the Triple A at the moment.  The Court has to reviewed the
14    claimant's statements of claims which were submitted under
15    cover of letter dated April 30, 2018.  It suffices to know that
16    it seeks damages for breach of Jacobi's agreement with the
17    government and same as to Kakaulin, indemnification and there
18    is as noted abuse of process claim and tortious interference
19    claim and the sixth claim for relief is declaratory judgment
20    that claimants neither took nor ever used Blink's alleged trade
21    secrets or other confidential information.
22         As counsel for Blink has pointed out, the issues in
23    the action before me are not identical to the issues in the
24    pending arbitration.  But as he has asserted that there may be
25    inefficiencies in both the arbitration and the lawsuit going

1   forward.  He's expressed the view that this district court

2   action is the preferred forum because arbitration will be

3   permissible and that all issues in the arbitration essentially

4   will be resolved by a resolution of this lawsuit.  As he put it

5   there won't be anything left to arbitrate.  He notes that there

6   is an overlap of fact and an overlap of issues but not all

7   issues will be resolved in the arbitration if the arbitration

8   proceeds and this action is stayed.

9          In this circuit the question of a stay under the

10  court's inherent powers and control of its docket is well

11  established.

12         And you can look at the Sierra Rupile v. Patts

13  decision by the Circuit.  The law goes back pretty much long

14  before that, back to a 1960 case decided by the Circuit.

15         And one of the things that a Court looks at is whether

16  there are issues common to the arbitration and the Court

17  proceeding and here there clearly are.  Jacoby and Kakaulin are

18  central to the claims that are pending before me and central to

19  the claims that are brought in the arbitration and is their

20  taking or not taking trade secrets, whether there are trade

21  secrets to be taken in the first place, these are issued raised

22  in both the action before me and the arbitration.

23         And while one doesn't know what would happen if the

24  action before me proceeded to judgment or whether the

25  arbitration proceeded to an award, I would say that there is a

1    strong prospect that issues in the case cause before would be

2    finally determined by the arbitration, including whether there

3    were trade secrets in the first place and whether Jacobi and

4    Kakaulin breached the NDA.  That should be resolved in the

5    arbitration in the first instance.

6            There is no indication before me that this arbitration

7    cannot be resolved in a reasonable period of time.  And one of

8    the other points I wanted to make is the overlap between Defend

9    Trade Secrets Act claim and those that are brought either by

10   way of contract or by common law.

11           The parties should take a look at Free Country Limited

12   v. Drennen 235 F.Supp 3d 559 cited in 2016 by one of my

13   colleagues, that both -- Well, as it was put the

14   Misappropriation of Trade Secrets claim requires a plaintiff to

15   show that defendants used that trade secret in breach of

16   agreement, confidential relationship or duty or as a result of

17   discovery by improper means.

18           That is to make out the common law claims and that the

19   show of violation of the defendant Trade Secret Act, the

20   plaintiff must establish the use of a trade secret by one who

21   used improper means to acquire the secret or at the time of

22   disclosure knew or had reason to know that trade secret was

23   acquired under improper means under circumstances giving rise

24   to a duty to maintain the secrecy of the trade secret or

25   derived from what -- a person who owed such a duty.  So it

I5EAABLIC                        Conference

1    seems to me that overlap is very strong.

2              Now, to protect Blink I'm not granting a stay in this

3    case pending the completion of arbitration.  I'm granting a

4    stay only until September 30, 2018 and I'm going to require a

5    report by October 15, 2018 as to the status of the arbitration

6    as of September 30, 2018.  So the stay technically will run

7    till my decision pending the receipt of the report on

8    October 15.  The parties are free at that point to move to

9    vacate the stay or move to continue the stay at that point.

10   And I'll see where things are in the arbitration.

11             Is there anything further from the plaintiff?

12             MR. SNYDER:  No, your Honor.  Thank you very much.

13             THE COURT:  Anything further from the defendant?

14             MR. KAYMAN:  No.  Thank you very much, your Honor.

15             THE COURT:  All right.  Thank you all very much.

16             MR. SNYDER:  Your Honor, may I approach?

17             THE COURT:  Sure.

18             MR. KAYMAN:  You want me there?

19             THE COURT:  Yes.  Come on up.

20             Off the record.

21             (Adjourned)

22

23

24

25